Filed 9/24/14  P. v. Johnson CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# COPY

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

|  |  |
|---|---|
| THE PEOPLE,<br><br>       Plaintiff and Respondent,<br><br>   v.<br><br>KENNETH JOHNSON,<br><br>       Defendant and Appellant. | C068950<br><br>(Super. Ct. No. 09F00426) |

In this case, defendant Kenneth Johnson was charged with four counts of first degree residential burglary.  (Pen. Code, § 459; unless otherwise stated, statutory references that follow are to the Penal Code.)  The trial court admitted evidence of uncharged criminal conduct (i.e., four prior residential burglaries) to establish that defendant committed the charged offenses pursuant to a common plan or scheme (Evid. Code, § 1101, subd. (b)).  The court also admitted deoxyribonucleic acid (DNA) evidence

1

placing defendant at the scene of the crimes. The jury found defendant guilty as charged. The court denied defendant's motion to strike his prior strike convictions (*People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*)) and sentenced him to an aggregate sentence of 144 years to life in state prison.

On appeal, defendant raises a number of claims. He contends the trial court erred when it admitted evidence of his prior uncharged offenses to prove common plan or scheme; failed to adequately instruct the jury on the use of uncharged offense evidence; failed to clarify the meaning of "common plan or scheme" for purposes of CALCRIM No. 375; and failed to clarify the meaning of "slight evidence" and "possession" as those terms are used in CALCRIM No. 376. He further contends trial counsel was ineffective for failing to object to admission of DNA random match probability evidence or to request a limiting instruction as to that evidence. He also raises several claims of error related to the trial court's imposition of fees and fines. Lastly, he contends the trial court erred in denying his *Romero* motion on the ground that his sentence otherwise constitutes cruel and unusual punishment under the state and federal Constitutions.

As we will explain, the trial court did not abuse its discretion in admitting evidence of defendant's prior uncharged misconduct, nor did the court commit instructional error with respect to CALCRIM Nos. 375 or 376. We reject defendant's claim of ineffective assistance of counsel regarding the DNA evidence, and his claim of cruel and/or unusual punishment. Finally, with respect to defendant's various challenges to the imposition of fees and fines, we conclude he forfeited one of his claims and, as for the remainder, we will order the court's minute order and abstract of judgment be corrected as set forth herein. In all other respects, we affirm the judgment.

2

## A.    *Charged Offenses*

The charges against defendant stemmed from the following four residential burglaries committed in the East Sacramento area between September and December of 2008 (collectively, the charged offenses):

### 1.    *Count 1 - Adams/Cox Burglary (September 28, 2008)*

At approximately 11:00 p.m. on September 27, 2008, Jan Adams and John Cox went to bed in the upstairs bedroom of their two-story home located in East Sacramento. The doors were locked, but the dining room window was left open a few inches. The screen on the window was intact.

The next morning, Cox went downstairs and noticed his cordless telephone was on the floor and the charging base had been pulled out of the wall. He walked into the dining room and saw that a window was wide open and the screen was detached. Cox and his wife discovered a laptop computer, a camera, and an iPhone were missing. The intruder had stolen cash from Adams' purse, but left behind her wallet and credit cards. The intruder also opened a gift wrapped present, but left the contents behind. Cox and Adams noticed an empty beer bottle in the refrigerator and another partially empty beer bottle on the backyard patio.

Criminalist Nikki Sewell developed a full DNA profile from swabs taken from the beer bottle in the refrigerator, and a partial DNA profile from the bottle on the back patio. Sewell uploaded the full DNA profile to state and federal DNA databases and learned there was a "cold hit" matching defendant's name. Defendant's DNA profile was part of the California DNA database because he provided a DNA sample following his conviction for four 1990 residential burglaries (the uncharged offenses discussed below).

Detective Joe Alioto queried the name "Kenneth Johnson" in the Sacramento Police Department database and found that name associated with a report of a recent

3

prowling incident at a home in East Sacramento. That discovery led to defendant's arrest on January 10, 2009. Defendant provided a buccal swab several days later.

Sewell received defendant's DNA sample, from which she developed a current DNA profile. She compared defendant's current DNA profile to the full and partial profiles developed from the beer bottles left at the Cox/Adams residence. Defendant's profile matched the full profile, and was consistent with the partial profile.

> 2.      *Count 2 - Bossung Burglary (November 10, 2008)*

On November 10, 2008, at approximately 10:00 p.m., Charles Bossung and his wife went to sleep in the upstairs bedroom of their two-story home located in East Sacramento. Although Bossung locked the doors before going to bed, he might have left some of the windows open that night. When he went to bed, his brown bifold wallet was inside the pocket of his pants, which he left either on the bed or on the chair beside the bed.

When Bossung awoke the next morning, he found his pants on the floor and his wallet and $35 in cash missing. Downstairs, Bossung discovered the window above the kitchen sink was wide open and the screen torn open and removed. He found the contents of his wallet (minus the cash) on the kitchen table, along with a worn trifold wallet he did not recognize as his.

At the time of defendant's arrest on January 10, 2009, he had in his possession a brown bifold wallet matching the description of the wallet taken from Bossung. Detective Alioto took the wallet to Bossung's house. When Bossung was shown the wallet, he said "it looked a lot like his wallet," but it had an exterior flap he did not recognize. The trifold wallet left at Bossung's home and the bifold wallet in defendant's possession were both tested for DNA. A buccal swab was collected from Bossung for comparison. Sewell developed a "mixture profile" from the trifold wallet. A "mixture profile" occurs where "more than one person's DNA is present on an item." The partial

4

DNA profile from the trifold wallet was consistent with the full profile obtained from the beer bottle left in the refrigerator at the Adams/Cox home and with the reference sample taken from defendant.

Sewell also developed a "mixture profile" from the brown bifold wallet in defendant's possession at the time of his arrest. She developed a full DNA profile from the major contributor (that is, the person who contributed more DNA than anyone else in the mixture). The full DNA profile matched Bossung's DNA profile.

*3.      Count 3 - Roberts Burglary (November 10, 2008)*

On November 9, 2008, sometime between 9:00 p.m. and 11:00 p.m., Ann Roberts and her mother went to sleep in the single-story duplex they shared in East Sacramento. Roberts thought all of the doors and windows were locked, but a kitchen window had been left unlocked and partially open.

The following morning, Roberts and her mother discovered the kitchen window had been pushed open and there was mud outside the window and inside on the kitchen counter. Roberts' laptop computer and digital camera were gone.

A palm print taken from the kitchen windowsill matched the print on file for defendant from 1990, as well as a recent print made at the time of his January 2009 arrest.

Roberts saw a story in the local newspaper following defendant's January 2009 arrest and recognized defendant from the picture. She recalled having seen defendant a month or so before the burglary as she waited at the bus stop across the street from her home. Defendant, whom Roberts had never seen before, commented that there were "some nice houses in this area." Roberts identified defendant at trial.

5

### 4. Count 4 - Travers/Cohn Burglary (December 30, 2008)

On December 29, 2008, at approximately 11:00 p.m., Catherine Travers and her husband Steve Cohn retired for the night in the upstairs bedroom of their two-story home in East Sacramento. Travers's and Cohn's daughter went to sleep shortly thereafter.

Travers's and Cohn's son arrived home at approximately 1:00 a.m. and entered the house through an unlocked door leading from the backyard into the TV room. He did not lock the door behind him or set the alarm. The next morning, Travers and Cohn discovered two flat-screen televisions, a Bose radio, and a camera were missing.

After defendant's arrest on January 10, 2009, Detective Alioto obtained a search warrant for 3430 Freedom Park, #6, an apartment believed to be defendant's residence. When police officers executed the warrant, defendant's roommate, Ivan Shaw, and Shaw's girlfriend were present, but not defendant. Police found mail addressed to "Kenneth Johnson" at the apartment. Police also found two flat-screen televisions. The serial number on the larger of the two televisions matched that of one of the televisions stolen from the Travers/Cohn home. The serial number on the smaller television had been removed, but Cohn later identified that television as his as well.

### B. Uncharged Offenses

The parties stipulated that defendant was convicted, on November 20, 1990, of four counts of first degree residential burglary as a result of the following incidents (collectively, the uncharged offenses):

### 1. Roth Burglary (May 24, 1990)

On May 23, 1990, at approximately 11:00 p.m., Robert Roth and his wife and daughters retired to their respective upstairs bedrooms in their two-story East Sacramento home. The doors and windows were locked, except for a first-floor bathroom window, which was left open for ventilation.

6

The next morning, Roth awoke to a telephone call from the California Highway Patrol informing him that his car had been recovered. He went downstairs and discovered the screen on the bathroom window had been pried loose and the window was wide open. His wife's purse and its contents were missing. Roth looked in his garage and confirmed that his car had been stolen. He eventually recovered the car.

2.      *Ives Burglary (May 27, 1990)*

On May 26, 1990, at approximately 11:00 p.m., Kenneth Ives and his wife went to sleep in the upstairs bedroom of their two-story East Sacramento home. At approximately 2:00 a.m., they were awakened by the sound of a "commotion" that sounded like dishes rattling in the downstairs kitchen. Ives crept partway down the staircase and looked from the stairwell into the kitchen, where he saw a black male climbing down from the kitchen counter. Ives yelled and the man jumped out the kitchen window. Although nothing was stolen during the break-in, Ives discovered the kitchen window screen had been removed and the window pried open with a screwdriver that was left lying outside underneath the window. Ives did not get a good look at the intruder and was unable to identify him.

3.      *Wasserman Burglary (May 28, 1990)*

On May 27, 1990, at approximately 11:00 p.m., Eric Wasserman and his wife went to sleep in the upstairs bedroom of their two-story home in East Sacramento. All the doors were locked, but the windows were not. Wasserman awoke the next morning to find the kitchen window open. His money and car keys were missing and his car was gone. He also found Fig Newton wrappers on the floor. The car was recovered within a few days, but was damaged beyond repair.

*4.      Green Burglary (June 21, 1990)*

On June 20, 1990, at approximately 11:00 p.m., Kathleen Green and her husband went to sleep in the upstairs bedroom of their two-story East Sacramento home. They awoke the next morning to discover the window in the breakfast nook was open and the screen had been removed. Green's purse, which she had placed on the counter the night before, was now on the patio with the contents strewn about. Her money and car keys were gone, as was her car.

As previously set forth to these 1990 offenses, defendant was later tried and convicted of four counts of first degree residential burglary. (§ 459.)

As to each of the 2008 four counts, the jury found true the allegation that another person, not an accomplice, was present during the commission of the burglary. (§ 667.5, subd. (c)(21).) In a bifurcated proceeding, the trial court found true the allegation that defendant suffered 10 prior convictions, all for first degree residential burglary.

At the time of sentencing in the matter presently before us, defendant filed a *Romero* motion requesting that the trial court strike all 10 of his prior convictions on the grounds that those prior convictions, all property crimes, were too remote and the recommended multiple life sentence constituted cruel and unusual punishment under the United States Constitution. The court denied the *Romero* motion and sentenced defendant to four consecutive terms of 25 years to life in state prison pursuant to the three strikes law (§§ 667, subds. (b)-(i), 1170.12), plus two five-year terms as to each of the four counts for defendant's prior serious felony convictions (§ 667, subd. (a)), and an additional one-year term as to each of the four counts for defendant's prior prison terms (§ 667.5, subd. (b)), for an aggregate determinate sentence of 44 years followed by an aggregate indeterminate sentence of 100 years to life. The court also imposed various fees and fines.

DISCUSSION

I

*Admissibility of Uncharged Offense Evidence*

Defendant contends the trial court abused its discretion when it admitted evidence of the four uncharged offenses to prove he committed the charged offenses pursuant to a common plan or scheme.

During pretrial proceedings, the prosecution moved in limine to admit evidence of 10 prior residential burglaries committed by defendant between 1988 and 1990. The trial court, after considering the parties' arguments, found "the prior burglaries were similar for purposes of proving identity, to the extent they are offered to prove identity, and also common plan," but expressed concern regarding the prejudicial effect of admitting evidence of all 10 prior convictions. The court heard argument regarding admissibility of the uncharged offenses under Evidence Code section 352 and issued its tentative ruling finding "the conduct is similar, based on the case law, to show common plan and scheme, as those words are used in the case law." The court stated that, having "examined and balanced the prejudice with the probative value," evidence of defendant's prior uncharged misconduct would be limited to four of the six prior burglaries the court found to be admissible.

The court subsequently clarified its tentative ruling, explaining that it found six of the 10 prior burglaries were "similar in terms of location, time of day/night, method of entry, characteristics of the residences to show a common plan and scheme," and of those six, the prosecution would be allowed to select four to present to the jury.

The prosecution elected to present evidence of the four uncharged offenses discussed above. Defense counsel objected that any probative value of that evidence was outweighed by its prejudicial effect, given "the number of them" and that they "are from 20 years ago." The prosecution countered that "the evidence in this case is similar, if not

practically identical . . . to the evidence in the prior cases. And the People believe that there are sufficient similarities to even prove identification under [Evidence Code section] 1101(b)."

The court issued its final ruling as follows:

"The Court is going to confirm and adopt its tentative ruling as its final ruling with respect to these issues. The admissibility does depend on the materiality of the facts sought to be proven and the tendency of the prior crime or crimes to prove the material facts. I have considered the remoteness argument; however, given the fact that [defendant] was incarcerated and the period of time when he was not incarcerated to the offense dates alleged in this case is not remote.

"So [defendant's] case of these prior crimes and his conduct in committing these prior crimes, given their many, many traits of similarity, tends to prove material facts at issue here. The Court has considered the probative value, the Court has considered the prejudicial value, the Court has weighed the relevant facts, and I do confirm as my final ruling the tentative ruling previously issued."

As set forth above, the prosecution presented evidence of the four uncharged offenses. The parties stipulated that defendant was convicted of those offenses on November 20, 1990.

As a general rule, evidence of uncharged crimes is inadmissible to prove the defendant had the propensity or disposition to commit the charged crime. (Evid. Code, § 1101, subd. (a); *People v. Lindberg* (2008) 45 Cal.4th 1, 22 (*Lindberg*); *People v. Ewoldt* (1994) 7 Cal.4th 380, 393 (*Ewoldt*).) Evidence of other crimes is admissible, however, when relevant for a noncharacter purpose -- that is, when it is relevant to prove some fact other than the defendant's criminal disposition, such as "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident." (Evid. Code, § 1101, subd. (b); *Lindberg*, *supra*, 45 Cal.4th at p. 22; *Ewoldt*, *supra*, 7 Cal.4th at p. 393.)

The degree of similarity required between the uncharged misconduct and the charged offense differs depending upon the intended use of the evidence.

"The least degree of similarity . . . is required in order to prove *intent*. [Citation.] . . . In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant ' "probably harbor[ed] the same intent in each instance." [Citations.]' [Citation.]

"A greater degree of similarity is required in order to prove the existence of a *common design or plan*. As noted above, in establishing a common design or plan, evidence of uncharged misconduct must demonstrate 'not merely a similarity in the results, but such a concurrence of common features that the various acts are naturally to be explained as caused by a general plan of which they are the individual manifestations.' [Citation.] . . . .

"To establish the existence of a common design or plan, the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual. . . . Unlike evidence of uncharged acts used to prove identity, the plan need not be unusual or distinctive; it need only exist to support the inference that the defendant employed that plan in committing the charged offense. [Citation.]

"The greatest degree of similarity is required for evidence of uncharged misconduct to be relevant to prove *identity*. For identity to be established, the uncharged misconduct and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts. [Citation.] 'The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature.' [Citation.]" (*Ewoldt, supra,* 7 Cal.4th at pp. 402-403, italics added.)

Courts subject other crimes evidence to " 'extremely careful analysis' " (*Ewoldt*, *supra*, 7 Cal.4th at p. 404) and review the admission of such evidence for

11

abuse of discretion (*Lindberg*, *supra*, 45 Cal.4th at p. 23; *People v. Kipp* (1998) 18 Cal.4th 349, 369).

We find the trial court did not abuse its discretion in admitting evidence of the four uncharged offenses to show a common plan or scheme.

We first observe that the similarity between the uncharged offenses and the charged offenses is striking. In all four uncharged offenses, defendant burglarized a two-story home in East Sacramento sometime between 11:00 p.m. and early the next morning. As the victims slept upstairs, defendant entered the home through a downstairs window by removing the screen (if there was one) and either opening an unlocked window or prying open a locked window. In three of the burglaries, defendant entered the home through the downstairs kitchen window; in the fourth, through a downstairs bathroom window. Defendant made off with the victims' property in three of the burglaries, and might have in the fourth had he not been interrupted by the victim. In one of the burglaries, defendant helped himself to food from the pantry and left the wrappers behind.

Similarly, in all four charged offenses, defendant burglarized homes (three of which were two-story) located in East Sacramento sometime between 11:00 p.m. and early the following morning, as the victims slept in their bedrooms. In three of the burglaries, defendant entered the two-story home through a downstairs window by removing the screen (if there was one) and opening an unlocked window. In the fourth, he entered the one-story home through an unlocked door. In each incident, defendant made off with the victims' property. In one of the burglaries, defendant helped himself to beer from the refrigerator and left the bottles behind.

We conclude the uncharged and charged offenses "are sufficiently similar to support the inference that they are manifestations of" a common plan or scheme. (*Ewoldt, supra,* 7 Cal.4th at pp. 393, 401-402, 403.) Thus, "[t]he trial court, after hearing objection and argument on the issue, properly determined that the circumstances of the

12

[uncharged offenses] were sufficiently similar to the charged offense[s] to warrant the inference that [defendant] was implicated in all." (*People v. Debnam* (1968) 261 Cal.App.2d 206, 211.) "Where composite elements of the prior crimes disclose a peculiar consistent plan, or method of operation, the probative value of such evidence showing a behavior pattern which tends to identify the accused as the perpetrator of the crime renders the evidence admissible." (*Ibid.*)

Our inquiry does not, however, end there. "Since 'substantial prejudicial effect [is] inherent in [such] evidence,' uncharged offenses are admissible only if they have *substantial* probative value." (*People v. Thompson* (1980) 27 Cal.3d 303, 318, fn. omitted.) We must determine whether the probative value of such evidence is " 'substantially outweighed by the probability that its admission [would] . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' (Evid. Code, § 352.)" (*Ewoldt, supra*, 7 Cal.4th at p. 404.)

The trial court has broad discretion in assessing whether the probative value of particular evidence is substantially outweighed by concerns of undue prejudice, the exercise of which must not be disturbed on appeal except upon a showing the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124-1125; accord *People v. Rogers* (2013) 57 Cal.4th 296, 326; *People v. Thomas* (2011) 52 Cal.4th 336, 354-355 ["A court abuses its discretion when its ruling 'falls outside the bounds of reason' "].)

As we explain, the trial court did not err. The principal factor we consider in determining the probative value of the uncharged offenses is whether that evidence tends to demonstrate the existence of a common design or plan. (*Ewoldt, supra*, 7 Cal.4th at p. 404.) It does. As discussed above, the similarity between the uncharged and charged offenses is unmistakable. Defendant was convicted of the uncharged burglaries, all of which were committed in a distinct area in a distinct manner. The charged burglaries

13

were committed in the same distinct area in virtually the identical manner. The inference is strong that "defendant was acting pursuant to a common design or plan." (*Ibid.*)

In determining probative value, we also consider other factors including: whether the source of evidence concerning uncharged offenses is independent of and unaffected by information about the charged offense; whether the defendant was punished for the prior misconduct; whether the uncharged offense is more inflammatory than the charged offense; and whether the two incidents occurred close in time. (*Id.* at pp. 404-405.)

The sources of the uncharged offense evidence were the victims of those prior crimes, which crimes were entirely separate from, and thus independent of and unaffected by, the current charges. Therefore, there was no risk the witnesses to the uncharged offenses had been influenced by the information in the charged offenses. Defendant was punished for all of the uncharged offenses, thus there was no risk the jury "might have been inclined to punish defendant for the uncharged offenses, regardless whether it considered him guilty of the charged offenses." (*Ewoldt, supra*, 7 Cal.4th at p. 405.) The uncharged offenses were no more inflammatory than the charged offenses, as they all involved burglaries of East Sacramento homes at night while the victims slept. Nor were the uncharged offenses too remote in time to be probative, given that the charged offenses were committed in 2008, the uncharged offenses occurred in 1990, and defendant was incarcerated for a significant period of time in between. Finally, we note that, in balancing the probative value of the uncharged offense evidence against any undue prejudice, the trial court carefully considered the arguments of the parties and determined only four of the 10 would be admitted "with a view to obviating the prejudice." Considering all of the circumstances, we conclude the uncharged offense evidence had substantial probative value for the purpose of proving common plan or scheme. We thus reject defendant's assertion to the contrary.

We also reject defendant's argument that admission of the uncharged offense evidence deprived him of his constitutional right to a fair trial. "The admission of

14

relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair." (*People v. Falsetta* (1999) 21 Cal.4th 903, 913.) Because, as previously discussed, the inference is strong that defendant was acting pursuant to a common design or plan, and given the trial court's care in considering the probative value of the evidence versus its prejudicial effect, it cannot be said that the jury " 'must have used the evidence for an improper purpose.' " (*People v. Hunt* (2011) 196 Cal.App.4th 811, 817.)

We further reject defendant's argument that evidence of a common design or plan was not relevant to prove or disprove any disputed fact of consequence to the determination of the action. Relying primarily on *Ewoldt, supra,* 7 Cal.4th at pp. 390-394, and *People v. Balcom* (1994) 7 Cal.4th 414, 423 (*Balcom*), he urges common design or plan evidence "assum[es] that the defendant is the perpetrator" and is thus only relevant to determine what crimes the defendant committed (that is, the actus reus). He argues that where, as here, "[t]he criminal acts and the underlying criminal intent were beyond dispute," there was no need for any additional evidence to prove actus reus. We do not agree with defendant's narrow interpretation of the applicable case law.

" 'Relevant evidence' " means evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) Defendant's plea of not guilty to the charge of violating section 459 placed all elements of the crime in dispute. (*Lindberg*, *supra*, 45 Cal.4th at p. 23; *Balcom, supra,* 7 Cal.4th at p. 422.) That is, all elements of the charged offenses, including the actus reus, were disputed.

In *Ewoldt,* the defendant was charged with committing lewd acts on a child under the age of 14 years. The trial court admitted evidence tending to establish that the defendant had committed a prior uncharged lewd act on the victim, and had also committed prior uncharged lewd acts on the victim's older sister. (*Ewoldt, supra,* 7 Cal.4th at pp. 386-389.)

15

In reviewing the admissibility of evidence of the uncharged misconduct, our Supreme Court explained the differing degrees of similarity between the uncharged misconduct and the charged offense required to establish intent, common design or plan, and identity. (*Ewoldt*, *supra*, 7 Cal.4th at pp. 402-403.) Applying that test, the court concluded the evidence of the defendant's uncharged misconduct shared "sufficient common features with the charged offenses to support the inference that both . . . are manifestations of a common design or plan," and "[s]uch evidence is relevant to establish that defendant committed the charged offenses in accordance with that plan." (*Id.* at p. 403.)

Next, the high court determined the probative value of the uncharged misconduct evidence was not "substantially outweighed" by the probability of undue prejudice, confusion of the issues, or misleading the jury, and concluded the trial court did not abuse its discretion in admitting such evidence. (*Ewoldt, supra,* 7 Cal.4th at pp. 404-405.)

In *Balcom*, the defendant was retried on a charge of rape after the jury in the original trial found him guilty of robbery but was unable to reach a verdict on rape and burglary counts. The trial court admitted evidence which tended to establish that the defendant had committed a rape and robbery in Michigan less than two months prior to the charged offense. (*Balcom, supra*, 7 Cal.4th at p. 418.)

On review, the high court concluded the evidence of the uncharged offenses was admissible "to demonstrate the existence of a common design or plan which, in turn, was relevant to establish that defendant either employed or developed that plan in committing the charged offenses." (*Balcom, supra*, 7 Cal.4th at pp. 421, 426.) The court further concluded "the probative value of the evidence of defendant's uncharged offenses, in establishing the existence of a common design or plan, outweighed its prejudicial effect." (*Id.* at p. 427.)

Neither *Ewoldt* nor *Balcom* hold, as defendant suggests, that evidence of common design or plan assumes the defendant is the perpetrator and constrains admissibility of

such evidence to prove the actus reus of the offense, in a vacuum. Indeed, defendant's interpretation of these cases would have us bar otherwise relevant uncharged offense evidence without permitting the trial court to conduct an Evidence Code section 352 analysis and exercise its discretion as to the admissibility of that evidence. Instead, where sufficient similarity between the uncharged and charged offenses to prove common design or plan is demonstrated, both cases hold that evidence is admissible for the purpose of establishing that *the defendant engaged in the conduct alleged to constitute the charged offense*, subject to a finding of substantial probative value pursuant to Evidence Code section 352.

Consistent with *Ewoldt* and *Balcom*, where, as here, no element of the charged offense has been conceded, the uncharged offense is sufficiently similar to the charged offense to support the inference that both are manifestations of a common design or plan, and the uncharged offense evidence is shown to have substantial probative value, evidence of the uncharged offense is admissible to establish that defendant committed the charged offenses in accordance with the common design or plan. (*Ewoldt, supra,* 7 Cal.4th at p. 403; *Balcom, supra,* 7 Cal.4th at p. 426.)

Defendant argues at length that the prosecution's evidence was not sufficient on the issue of identity to outweigh the prejudicial effect of the uncharged offense evidence. For instance, he argues the only evidence of guilt in the Travers/Cohn burglary stemmed from the fact that the stolen items were found in the apartment he and Shaw shared, despite that he was "not found in actual possession of stolen property" because he was in custody when the apartment was searched; the DNA evidence in the Adams/Cox and Bossung burglaries was "flawed"; and the "fingerprint-only evidence" in the Roberts burglary, while perhaps sufficient to sustain a conviction, is not overwhelming enough to overcome the admission of other prejudicial evidence. Defendant's arguments go to the weight of the evidence, not its admissibility. Defendant cross-examined the prosecution's expert witnesses. In the end, the jurors gave the evidence the weight they

17

thought it deserved and found defendant guilty beyond a reasonable doubt.  In the absence of error, it is not for us to question the jury's determination.

The trial court did not abuse its discretion, pursuant to Evidence Code sections 1101, subdivision (b), and 352, in admitting evidence of the uncharged offenses.

II

*CALCRIM No. 375*

Defendant contends the trial court erred by failing to correctly instruct the jury on the limited purpose for which the uncharged offense evidence was admitted.  He further contends his trial counsel was prejudicially ineffective for failing to request modification and clarification of the given instruction.

The trial court instructed the jury with CALCRIM No. 375 on the issue of uncharged crime evidence in part as follows:  "*If you decide that the defendant committed the uncharged acts, you may, but are not required to, consider that evidence for the limited purpose of deciding whether or not:*  [¶]  *The defendant had a plan or scheme to commit the offenses alleged in this case.*  [¶]  In evaluating this evidence, consider the similarity or lack of similarity between the uncharged acts and the charged offenses.  [¶]  Do not consider this evidence for any other purpose except for the limited purpose described herein.  [¶]  Do not conclude from this evidence that the defendant has a bad character or is disposed to commit crime.  [¶]  If you conclude that the defendant committed the uncharged acts, that conclusion is only one factor to consider along with all the other evidence.  It is not sufficient by itself to prove that the defendant is guilty of any of the charges or allegations.  The People must still prove every charge and allegation beyond a reasonable doubt."  (Italics added.)

Defendant did not object during pretrial proceedings when the court stated its intent to give CALCRIM No. 375, nor did he object when the instruction was given to the jury.  "Generally, a party forfeits any challenge to a jury instruction that was correct in

18

law and responsive to the evidence if the party fails to object in the trial court" unless "the instruction was an incorrect statement of the law [citation], or . . . the instructional error affected the defendant's substantial rights." (*People v. Franco* (2009) 180 Cal.App.4th 713, 719 (*Franco*).)  Substantial rights are equated with a miscarriage of justice, which results if it is reasonably probable the defendant would have obtained a more favorable result had the error not been committed.  (*People v. Christopher* (2006) 137 Cal.App.4th 418, 426-427; *People v. Watson* (1956) 46 Cal.2d 818, 835-836.)

"We review de novo whether a jury instruction correctly states the law. [Citations.]  Our task is to determine whether the trial court ' "fully and fairly instructed on the applicable law." [Citation.]' [Citation.]  When instructions are claimed to be conflicting or ambiguous, 'we inquire whether the jury was "reasonably likely" to have construed them in a manner that violates the defendant's rights.' [Citation.]  We look to the instructions as a whole and the entire record of trial, including the arguments of counsel.  [Citations.]  We assume that the jurors are ' " 'intelligent persons and capable of understanding and correlating all jury instructions . . . given.' " ' [Citation.]  If reasonably possible, we will interpret the instructions to support the judgment rather than to defeat it.  [Citation.]  Instructional error affects a defendant's substantial rights if the error was prejudicial under the applicable standard for determining harmless error." (*Franco, supra*, 180 Cal.App.4th at p. 720; italics omitted.)

Defendant argues the court failed its sua sponte duty to instruct the jury on the meaning of "plan or scheme," words which according to defendant have a technical meaning peculiar to the law.  He urges, as he did in his previous argument, that common plan or scheme evidence is only admissible to prove actus reus and, without further guidance from the court, there was a reasonable likelihood the jurors would incorrectly assume such evidence could also be used to prove intent and identity.  He also argues the instruction permitted the jury to find an " 'intermediate fact' (i.e., defendant had a plan or scheme to commit burglaries) without identifying the 'ultimate fact' in dispute."

19

"The court is under a general obligation to 'clear up any instructional confusion expressed by the jury,' but '[w]here . . . the original instructions are themselves full and complete, the court has discretion . . . to determine what additional explanations are sufficient to satisfy the jury's request for information.' " (*People v. Dykes* (2009) 46 Cal.4th 731, 802 (*Dykes*).) "In general the trial court has a sua sponte duty to give amplifying or clarifying instructions ' "where the terms used [in an instruction] have a technical meaning peculiar to the law." ' " (*People v. Richie* (1994) 28 Cal.App.4th 1347, 1360.)

"The language of a statute defining a crime or defense is generally an appropriate and desirable basis for an instruction, and is ordinarily sufficient when the defendant fails to request amplification. If the jury would have no difficulty in understanding the statute without guidance, the court need do no more than instruct in statutory language." (*People* v. *Poggi* (1988) 45 Cal. 3d 306, 327.) "A word or phrase having a technical, legal meaning requiring clarification by the court is one that has a definition that differs from its nonlegal meaning. [Citation.] Thus, . . . , terms are held to require clarification by the trial court when their statutory definition differs from the meaning that might be ascribed to the same terms in common parlance. [Citation.]" (*People v. Estrada* (1995) 11 Cal.4th 568, 574 (*Estrada*); italics omitted.) "When a term is commonly understood by those familiar with the English language and is not used in a technical sense peculiar to the law, an instruction as to its meaning is not required in the absence of a request." (*People v. Williams* (1988) 45 Cal.3d 1268, 1314 (*Williams*).)

Evidence Code section 1101, subdivision (b), provides that evidence of uncharged crimes may be admitted to prove "plan." Consistent with that language, the jury was instructed that it could consider the uncharged offense evidence for the purpose of deciding whether defendant had a "plan or scheme" to commit the charged offenses. The terms "plan" and "scheme" are commonly understood. The dictionary defines "plan" as: "2a: a method for achieving an end; b: an often customary method of doing something;

20

. . . c: a detailed formulation of a program of action; d: goal, aim." (Merriam-Webster's Collegiate Dict. (11th Ed. 2006) p. 947.) The dictionary defines "scheme" as: "3: a plan or program of action; esp: a crafty or secret one." (*Id.* at p. 1110.) We are aware of no different technical legal definitions of the terms "plan" or "scheme," and defendant has not provided us with any. Thus, we conclude neither "plan" nor "scheme" is a technical term requiring further explanation, and CALCRIM No. 375, as given, was full and complete. Because defendant did not request modification or clarification of those terms, no additional instruction was required.

Moreover, the fact that CALCRIM No. 375 admonished the jury that the uncharged offense evidence could be considered only for "plan or scheme" did not result in a miscarriage of justice. We presume the jury followed the trial court's instructions and considered the evidence, if at all, for that limited purpose. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 803; *People v. Waidla* (2000) 22 Cal.4th 690, 725; *People v. Cline* (1998) 60 Cal.App.4th 1327, 1336.)

Finally, defendant contends his trial counsel rendered ineffective assistance by failing to ensure the given instruction was properly worded. As we read this contention, it harkens back to defendant's claim that evidence of a common scheme or plan is only admissible to prove the actus reus, an argument that we have earlier rejected. That is, defendant's argument apparently is that his counsel at trial should have requested an instruction that limited consideration of the uncharged offenses to the actus reus. Having rejected that argument, we are confident that defendant's attorney did not object to the instruction because, rightly, he did not think the instruction as read mistated the law. Defendant did not suffer ineffective assistance of counsel.

*CALCRIM No. 376*

*A.    Clarification of "Slight" Evidence*

Defendant challenges CALCRIM No. 376, the pattern jury instruction for the crime of possession of recently stolen property.  As given to the jury, it read:

"If you conclude the defendant knew he possessed property and you conclude the property had, in fact, been recently stolen, you may not convict the defendant of burglary based on those facts alone.  However, if you also find that supporting evidence tends to prove his guilt, then you may conclude that the evidence is sufficient to prove he committed burglary.  [¶]  The supporting evidence need only be slight and need not be enough, by itself, to prove guilt.  You may consider how, where, and when the defendant possessed the property, along with any other relevant circumstances tending to prove his guilt.  [¶]  Remember that you may not convict the defendant of any crime unless you are convinced that each fact essential to the conclusion that the defendant is guilty of that crime has been proved beyond a reasonable doubt."  Defendant did not object to CALCRIM No. 376, as given.

During deliberations, the jury submitted the following question:  "Regarding [pages] 24-25 of jury instructions, what is slight evidence?  Is M.O. considered slight evidence?  . . .  Is timeline, time of day, neighborhood considered slight evidence?"

The record reflects that pages 24 and 25 of the jury instructions included CALCRIM Nos. 376 and 1700.

Following a discussion with counsel off the record, the court stated:  "We agreed that in response to the jury's question, the Court will instruct them as follows:  [¶] . . . [¶] The jury is to evaluate all of the evidence, decide what the facts are, and determine whether there is 'slight evidence.'  [¶]  Under the law, the Court is not to instruct the jury

as to what constitutes 'slight evidence.' " Defense counsel said, "I agree, your Honor. It's fine."

Defendant now contends the trial court improperly responded to the jury's request for clarification of the meaning of "slight" evidence, as that term is used in CALCRIM No. 376. He also argues the court failed to adequately explain whether "modus operandi" evidence could be considered as "slight" evidence. (Italics omitted.)

As previously discussed, " '[w]here . . . the original instructions are themselves full and complete, the court has discretion . . . to determine what additional explanations are sufficient to satisfy the jury's request for information.' " (*Dykes, supra,* 46 Cal.4th at p. 802.) "When the trial court responds to a question from a deliberating jury with a generally correct and pertinent statement of the law, a party who believes the court's response should be modified or clarified must make a contemporaneous request to that effect; failure to object to the trial court's wording or to request clarification results in forfeiture of the claim on appeal. [Citations.]" (*Ibid*.) Trial counsel's failure to object to the court's response to a jury question may be construed as approval of that response. (*People v. Boyette* (2002) 29 Cal.4th 381, 430; *People v. Price* (1991) 1 Cal.4th 324, 414; *People v. Kageler* (1973) 32 Cal.App.3d 738, 746.)

Defendant's failure to object to the original instruction, followed by his acquiescence in and approval of, the court's response to the jury's inquiry, forfeits his claim on appeal so long as the court's response was "a generally correct and pertinent statement of the law." (*Dykes, supra,* 46 Cal.4th at p. 802.) It was.

"CALCRIM No. 376 is based on a 'long-standing rule of law [that] allows a jury to infer guilt of a theft-related crime from the fact a defendant is in possession of recently stolen property when coupled with slight corroboration by other inculpatory circumstances [that] tend to show guilt.' " (*People v. Lopez* (2011) 198 Cal.App.4th 698, 709, quoting *People v. Barker* (2001) 91 Cal.App.4th 1166, 1173.) CALCRIM No. 376, like its predecessor CALJIC No. 2.15, "has repeatedly withstood constitutional attack."

23

(*People v. Snyder* (2003) 112 Cal.App.4th 1200, 1226; accord *People v. Solorzano* (2007) 153 Cal.App.4th 1026, 1035; *People v. O'Dell* (2007) 153 Cal.App.4th 1569, 1573-1577; *People v. Anderson* (2007) 152 Cal.App.4th 919, 946-950.)

The court's response to the jury's inquiry did nothing to change what was an otherwise full and complete instruction. Rather, it simply instructed the jury to determine on its own what constitutes "slight" evidence. Given that the term "slight" is commonly used in everyday parlance to mean "small of its kind or in amount" (Merriam-Webster's Collegiate Dict. (11th Ed. 2006) p. 1173) and has no different technical legal definition of which we are aware, the court was not required to further instruct as to its meaning. (*Estrada, supra,* 11 Cal.4th at p. 574; *Williams, supra,* 45 Cal.3d at p. 1314.) Thus, the court's response was a "generally correct and pertinent statement of the law," and defendant's failure to request further clarification on that point forfeits his claim on appeal. (*Dykes, supra,* 46 Cal.4th at p. 802.)

Our opinion in that regard is not altered by defendant's argument that the court failed to adequately address the jury's question whether "M.O. [is] considered slight evidence?" Defendant posits that the jury's inquiry revealed the possibility of improper use of "limited-purpose evidence to find slight corroboration." This, he argues, would be improper because common plan or scheme evidence "cannot be used, even as 'slight' evidence, to prove that [he] was the one who committed the burglary." Assuming, as defendant does, that the jury was referring to common plan or scheme evidence, we previously concluded CALCRIM No. 375 properly instructed on the limited use of uncharged offense evidence to find defendant had "a plan or scheme" to commit the charged offenses. CALCRIM No. 376 properly instructed that if the jury found defendant knew he possessed recently stolen property, that finding, together with supporting evidence (even if only slight) tending to prove his guilt, permitted but did not require the conclusion that "the evidence is sufficient to prove he committed burglary." Additionally, the jury was instructed to decide for itself "what the facts are . . . based only

24

on the evidence" presented at trial, to consider evidence admitted for a limited purpose "only for that purpose and for no other," and that it was the People's burden to prove defendant guilty beyond a reasonable doubt. Assuming, as we do, that the jury followed these and all of the trial court's instructions (*Cassim v. Allstate Ins. Co., supra,* 33 Cal.4th at p. 803; *People v. Waidla, supra,* 22 Cal.4th at p. 725; *People v. Cline, supra,* 60 Cal.App.4th at p. 1336), and that the jurors are intelligent persons, capable of understanding and correlating all jury instructions which are given (*People* v. *Kegler* (1987) 197 Cal.App.3d 72, 80), no further instruction was necessary.

Echoing his earlier claim, defendant argues he did not forfeit his claim because CALCRIM No. 375 failed to clarify common plan or scheme evidence as only admissible to prove actus reus and was therefore not full and complete. Thus, he argues, the court had a sua sponte duty to clarify the jury's confusion about "the concept of 'slight evidence' " and the use of modus operandi evidence. Having rejected his earlier claim, we reject this claim as well.

## B.     *Clarification of "Possession"*

Defendant contends the trial court further erred when it failed to clarify that the term "possession" means "exclusive possession." Without that narrowing instruction, he claims, CALCRIM No. 376 as given permitted the jury to draw an impermissible inference of guilt, thus violating his right to due process under the United States Constitution.

Defendant neither objected to the instruction, nor did he request any clarifying or amplifying language be given. Again, "a party forfeits any challenge to a jury instruction that was correct in law and responsive to the evidence if the party fails to object in the trial court" unless "the instruction was an incorrect statement of the law [citation], or . . . if the instructional error affected the defendant's substantial rights." (*Franco, supra,* 180 Cal.App.4th at p. 719; accord *People v. Samaniego* (2009) 172 Cal.App.4th 1148,

25

1163 [a party may not complain on appeal that an instruction correct in law and responsive to the evidence was flawed unless the party requested appropriate clarifying or amplifying language].) "The question is whether the error resulted in a miscarriage of justice under *People v. Watson*[, *supra*] 46 Cal.2d 818 [299 P.2d 243]. [Citation.]" (*People v. Anderson*, *supra*, 152 Cal.App.4th at p. 927.)

As previously discussed, CALCRIM No. 376 is a correct statement of the law. Defendant argues, however, that the trial court had a sua sponte duty to clarify the term "possession" because that term has a technical meaning peculiar to the law. For support, he relies on *People v. Rubio* (1977) 71 Cal.App.3d 757 (*Rubio*), disapproved on other grounds in *People v. Freeman* (1978) 22 Cal.3d 434, 438. In *Rubio*, defendant and his coconspirators held up a convenience store and fled, first in a car and then on foot. (*Rubio, supra,* at p. 762.) When defendant was apprehended, the arresting officers found "$ 100, presumably the fruits of the robbery, scattered in a flower bed located where defendant had just been standing." (*Id.* at pp. 763, 768.) At trial, the jury was instructed with CALJIC No. 2.15, the predecessor to CALCRIM No. 376. (*Id.* at p. 767.) The jury found the defendant guilty of robbery (§ 211). (*Id.* at p. 761.)

The court of appeal commented that "[t]he jury was never instructed, by CALJIC No. 1.24, or otherwise, as to what constituted 'possession' by the defendant," and concluded CALJIC No. 2.15 was erroneously given because, "[i]n the absence of an instruction defining possession, the jury must have assumed that the evidence established, without dispute, defendant's possession of stolen property. In actuality, however, this was an open question." (*Rubio, supra,* 71 Cal.App.3d at p. 768; fn. omitted.)

From this comment, defendant argues the technical meaning of "possession," as used in CALCRIM No. 376, is derived from former CALJIC No. 1.24, which provides that "a person is in possession of an article, object, or thing when it is under his dominion and control and to his knowledge either is carried on his person or is in his presence and custody, or, if not on his person or in his presence, *the dominion and control thereof is*

26

*immediate, accessible, and exclusive to him*." (*Rubio, supra,* 71 Cal.App.3d at p. 768, fn. 2, italics added.) He urges this language requires "[e]xclusivity of possession." We disagree for two reasons.

First, the facts of *Rubio* are distinguishable. Whereas in *Rubio*, the defendant was apprehended while at large and the money believed to be fruits of the robbery was found in a nearby flower bed, here, the recently stolen property was found during execution of a search warrant at the apartment believed by police to be defendant's residence, a belief which was confirmed by papers found at the apartment bearing defendant's name and by statements from Shaw indicating defendant in fact resided there.

Defendant responds that the stolen property was actually found "in Shaw's home, where [defendant] lived as a roommate," thus possibly identifying Shaw as the thief. Indeed, it is that distinction which, under the *permissible* inference of guilt, may actually have worked to defendant's advantage, as the jury could well have concluded Shaw committed the crimes and shared the spoils with his roommate, defendant, who neither participated in the burglaries nor knew the items were stolen.

Second, as the People correctly point out, the definition of the term "possession" is not limited to " 'exclusive' possession." According to the optional definition provided in CALCRIM No. 1750, "A person does not have to actually hold or touch something to possess it. It is enough if the person has [control over it] [or] [the right to control it], either personally or through another person."

To the extent defendant argues that the definitions of possession set forth in CALCRIM No. 1750 defines possession in the context of receiving stolen property, whereas it was here used to define possession for purposes of determining whether there could be an inference of guilt, we see no reason why, in this context at least, the legal definition of possession should differ. "When reviewing a purportedly ambiguous jury instruction, we ask whether there is a reasonable likelihood the jury misconstrued or misapplied the challenged instruction. [Citations.]" (*People v. Palmer* (2005)

27

133 Cal.App.4th 1141, 1156.) In making this determination, we consider the entire charge to the jury. (*People v. Musselwhite* (1998) 17 Cal.4th 1216, 1248.) We find no reasonable likelihood the jury was misled. The first sentence of CALCRIM No. 376 requires the jury to determine if defendant knew he possessed property. In making that determination, the jury could consider what weight, if any, should be given to evidence police found at Shaw's apartment, together with Shaw's testimony, that defendant lived at the apartment and was responsible for bringing the stolen items there. In light of the other instructions given by the trial court, it is not reasonably likely the jury was misled.

Next, defendant contends CALCRIM No. 376 permits the jury to draw an impermissible inference of guilt and violates his right to due process. He argues the inference of guilt--that "defendant's possession of stolen goods tends to identify him as the thief" [*Rubio, supra,* 71 Cal.App.3d at p. 768]--was stronger against Shaw because Shaw was present in the apartment when police arrived, the stolen items were in the apartment, one of the stolen televisions was mounted to the living room wall, and Shaw admitted having mounted the television there. Defendant argues that, because the court failed to narrow the term "possession" to "exclusive possession," the jury was not required to determine that possession of the stolen property identifies him, "*more likely than not*, as the thief."

"A permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury." (*Francis v. Franklin* (1985) 471 U.S. 307, 314-315 [85 L.Ed.2d 344, 353-354]; accord *Ulster County Court v. Allen* (1979) 442 U.S. 140, 157-163 [60 L.Ed.2d 777, 792-796] (*Ulster County*).) That is, there is no due process violation where there is a " 'rational connection' between the basic facts that the prosecution proved and the ultimate fact presumed, and the latter is 'more likely than not to flow from' the former." (*Ulster County, supra,* 442 U.S. at p. 165 [60 L.Ed.2d at p. 797].)

28

Here, the prosecution proved the basic facts that defendant shared an apartment with Shaw, the televisions stolen during the Travers/Cohn burglary were present in that apartment, and defendant brought those items to the apartment. While defendant attempts to discredit Shaw's testimony as "self-serving," the jury evidently thought otherwise. As for defendant's assertion that "the inference of guilt stemming from possession of stolen property was stronger against Shaw," CALCRIM No. 376 expressly states a determination of guilt *cannot* be based on possession alone. Even where there is corroborating evidence, the instruction says only that this *may* be considered in determining guilt.

Based on the entire charge to the jury, including the elements of burglary, the prosecution's burden of proof beyond a reasonable doubt, and the cautionary instruction to disregard any instruction that applied to facts it found did not exist (*People v. Holt* (1997) 15 Cal.4th 619, 677; *People v. Johnson* (1993) 6 Cal.4th 1, 37), we find no instructional error.

IV

*DNA Evidence*

Defendant contends his trial counsel rendered ineffective assistance of counsel by failing to object to the admission of DNA evidence, and by failing to request a limiting instruction with respect to that evidence.

As we have previously explained, a defendant claiming ineffective assistance of counsel has the burden to show: (1) counsel's performance was deficient, falling below an objective standard of reasonableness under prevailing professional norms; and (2) the deficient performance resulted in prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 693-694 [80 L.Ed.2d 674, 693-694, 697-698].) That is, "there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different. [Citations.]" (*People v. Kelly* (1992) 1 Cal.4th 495, 520.)

29

" ' "[I]f the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged[,] . . . unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation," the claim on appeal must be rejected.' [Citations.] A claim of ineffective assistance in such a case is more appropriately decided in a habeas corpus proceeding. [Citations.]" (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-267; accord *People v. Castillo* (1997) 16 Cal.4th 1009, 1015.) As long as trial counsel could have had *some* satisfactory explanation for the conduct complained of, we must reject defendant's claim of ineffective assistance here on direct appeal. (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

At trial, the prosecution's DNA expert, Nikki Sewell, testified that she uploaded the DNA profiles from the Adams/Cox beer bottles to state and federal DNA databases and got a "cold hit" identifying defendant as a suspect. She used a sample obtained from defendant to develop a current DNA profile, and when she compared it to the full and partial profiles developed from the Cox/Adams burglary, defendant's profile matched the full profile, and was consistent with the partial profile.

Sewell also conducted DNA testing on evidence associated with the Bossung burglary and determined that the partial profile developed from the trifold wallet left at Bossung's home was consistent with both the full profile from the Adams/Cox burglary and the full profile developed from defendant's sample. The mixture profile she developed from the brown bifold wallet in defendant's possession at the time of his arrest identified Bossung as a major contributor.

Finally, Sewell matched a palm print taken from the Roberts burglary to defendant's 1990 and 2009 profiles.

Sewell testified that she performed a statistical analysis and concluded the full profile obtained from the Adams/Cox sample "is estimated to occur at random among unrelated individuals at a frequency of 1 in 440 quadrillion of the African American population, 1 in 35 quintillion of the Caucasian population, and 1 in 110 quintillion of the

30

Hispanic population." According to her analysis of the partial profile from the Adams/Cox sample, "the partial profile . . . is estimated to occur at random among unrelated individuals at a frequency of 1 in 240,000 of the African American population, 1 in 320,000 of the Caucasian population, and 1 in 2 million of the Hispanic population."

Sewell explained that, in making those calculations, she utilized the product rule to determine the probability that the sample profile "would be found in the random population." She explained that "random match probability" means "the probability that a random sample, a random person, an unrelated person pulled from the population, would have that same evidence, match that evidence profile that you've obtained."

As the People correctly point out, defendant was represented at trial by two attorneys, one of whom (Kate Johnston) focused exclusively on issues related to DNA evidence. Johnston filed a 19-page motion in limine regarding DNA issues other than that presented here on appeal, and filed a proposed stipulation and limiting instruction regarding "cold hit" DNA evidence. At trial, Johnston conducted an extensive and thorough cross-examination of Sewell, which included questions related to random match probability, Sewell's method of calculating statistics, and the manner in which Sewell arrived at her conclusions regarding the DNA evidence.

"When counsel focuses on some issues to the exclusion of others, there is a strong presumption that [s]he did so for tactical reasons rather than through sheer neglect. [Citation.] That presumption has particular force where a petitioner bases his ineffective-assistance claim solely on the trial record, creating a situation in which a court 'may have no way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic motive.' [Citation.]" (*Yarborough v. Gentry* (2003) 540 U.S. 1, 8 [157 L.Ed.2d 1, 9].) Here, we have no way of knowing why defense counsel did not object to Sewell's characterization of statistics as random match probabilities in a cold hit case, or why counsel did not request a limiting instruction on that specific aspect of the DNA

31

evidence.  Johnston was not asked to explain why, and the record sheds no light in that regard.

In order to determine whether counsel could have had some satisfactory explanation for failing to act in the manner challenged, we must pause briefly to discuss the California Supreme Court case of *People v. Nelson* (2008) 43 Cal.4th 1242, 1247 (*Nelson*), a case on which both parties rely but disagree.  There, Nelson was tried and convicted in 2002, for a murder committed in 1976, after investigators compared evidence from the murder scene with Nelson's DNA profile and identified him as a possible suspect.  At trial, the prosecution presented evidence that "the odds that a random person unrelated to [Nelson] from the population group that produced odds most favorable to him could have fit the profile of some of the crime scene evidence are one in 930 sextillion (93 followed by 22 zeros)."  This court affirmed on appeal.

Noting that, "[b]ecause the world's total population is only about seven billion (seven followed by nine zeros), this evidence is tantamount to saying that defendant left the evidence at the crime scene," the California Supreme Court granted review to decide issues related to DNA "cold hits."  (*Nelson, supra*, 43 Cal.4th at p. 1247.)  In deciding the admissibility of the DNA evidence, the high court first explained that "[f]orensic DNA analysis is a comparison of a person's genetic structure with crime scene samples to determine whether the person's structure matches that of the crime scene sample such that the person could have donated the sample."  (*Id.* at pp. 1257-1258.)  The court referred to this court's summary of that process:

" 'With the exception of red blood cells, every cell in the human body has a nucleus containing the person's genetic code in the form of DNA.  . . .  DNA consists of two parallel spiral sides, a double helix, composed of repeated sequences of phosphate and sugar.  The sides are connected by a series of rungs, with each rung consisting of a pair of chemical components called bases.  . . .  There are four types of bases—adenine (A), cytosine (C), guanine (G), and thymine (T).  A will pair only with T, and C will pair

only with G. . . . There are over three billion base pairs in a person's DNA. . . . [¶] Except for identical twins, no two persons have identical DNA. . . . This makes DNA valuable for forensic purposes. However, there is no practical way of sequencing all three billion base pairs. . . . Accordingly, forensic scientists test particular regions called loci that are known to be polymorphic, i.e., variable from person to person. . . . Scientists have identified loci where a particular pattern of base pairs is repeated successively for numbers of times that vary from person to person. . . . These repetitions are referred to as alleles. . . . These alleles can be measured and compared to determine whether a suspect sample matches an evidentiary biological sample at each of the loci tested. . . .' (Citations omitted.)

"The Court of Appeal explained, 'The initial use of DNA for forensic purposes involved what is called restriction fragment length polymorphism (RFLP).' But RFLP testing is now obsolete. In this case, the testing was done by utilizing what is called 'polymerase chain reaction' testing using 'short tandem repeats' (PCR-STR). PCR-STR testing has many advantages over RFLP testing. It can test a far smaller sample than RFLP testing requires. It is less susceptible to sample degradation. It is simpler and less time consuming. Additionally, as the Court of Appeal also explained, 'With the ability to compare numerous loci, the discrimination power of PCR-STR testing is extremely high.'

"Once a match is found, the next question is the statistical significance of the match. (See *People v. Wilson* (2006) 38 Cal.4th 1237, 1242 [].) . . . When a suspect's sample is compared to the crime scene evidence, and a match is found, 'the DNA profile of the matched samples is compared to the DNA profiles of other available DNA samples in a relevant population database or databases in order to determine the statistical probability of finding the matched DNA profile in a person selected at random from the population or populations to which the perpetrator of the crime might have belonged.' (*People v. Soto* (1999) 21 Cal.4th 512, 518 [].) 'Experts calculate the odds or

percentages—usually stated as one in some number—that a random person from the relevant population would have a similar match.' (*People v. Wilson, supra*, at p. 1239.)

"Experts use a statistical method called the 'product rule' to calculate the rarity of the sample in the relevant population. We explained this method in detail in *People v. Soto, supra*, 21 Cal.4th at pages 524–525. As the Court of Appeal summarized it, 'The frequency with which each measured allele appears in the relevant population is estimated through the use of population databases. . . . The frequencies at each tested locus are multiplied together to generate a probability statistic reflecting the overall frequency of the complete multilocus profile. . . . The result reflects the frequency with which the complete profile is expected to appear in the population. . . . The result is sometimes expressed as the probability that the DNA of a person selected at random from the relevant population would match the evidentiary sample at all tested loci. . . .' (Citations omitted.)" (*Nelson, supra*, 43 Cal.4th at pp. 1258-1259.)

In considering Nelson's challenge to the validity of the product rule to calculate the relevant odds when a match comes about not by comparing a suspect's profile with the crime scene sample but by a cold hit from a database, the high court queried "[w]hether the odds calculated by the product rule are relevant, and thus admissible, in a cold hit case," and concluded that, "although the product rule is not the *only* available method of statistical analysis in a cold hit case, it is relevant and thus admissible." (*Nelson, supra,* 43 Cal.4th at pp. 1259-1260, 1266.)

The point of contention among the parties in the present case, however, arises out of the following comments by the *Nelson* court:

"It is certainly correct that, as one treatise that discussed this question put it, 'the picture is more complicated when the defendant has been located through a database search . . . .' (Modern Scientific Evidence, *supra*, § 32:11, p. 111.) The *Jenkins* court [*U.S. v. Jenkins* (D.C. 2005) 887 A.2d 1013, 1019–1020 (*Jenkins*)] recognized this circumstance. It explained that in a non-cold-hit case, the number derived from the

34

product rule 'represents two concepts:  (1) the frequency with which a particular DNA profile would be expected to appear in a population of unrelated people, in other words, how rare is this DNA profile ("rarity statistic"), and (2) the probability of finding a match by randomly selecting one profile from a population of unrelated people, the so-called "random match probability." ' (*Jenkins, supra*, 887 A.2d at p. 1018.)

"The [*Jenkins*] court explained that the government had conceded 'that *in a cold hit case, the product rule derived number no longer accurately represents the probability of finding a matching profile by chance*.  The fact that many profiles have been searched increases the probability of finding a match.'  [Citation.]  The footnote in the middle of this quotation elaborated:  *'In other words, the product rule number no longer accurately expresses the random match "probability."*  That same product rule number, however, still accurately expresses the rarity of the DNA profile.  Random match probability and rarity, while both identical numbers, represent two distinct and separate concepts.  Only one of those concepts is affected by a database search:  the random match probability.'  [Citation.]  The court noted that 'the "database match probability" [the approach suggested in the 1996 NRC Report] more accurately represents the chance of finding a cold hit match' and 'can overcome the "ascertainment bias" of database searches.  "Ascertainment bias" is a term used to describe the bias that exists when one searches for something rare in a set database.'  [Citation.]"  (*Nelson, supra*, 43 Cal.4th at p. 1266; italics omitted; the italics are ours.)

Here, defendant claims that, in a DNA cold hit case, statistical evidence based on the product rule is only relevant and admissible "to show the rarity of the given profile in the relevant population," but not "as evidence of random match probability."  He argues his claim finds support in *Nelson*, which, according to him, held "that product-rule based 'random match probability' statistics are *not relevant* in a cold hit case . . . because a cold hit [from] a computerized search *is not random*."  Consequently, he argues, his trial counsel should have objected to Sewell's characterization of statistics as random match

35

probabilities and should have requested a limiting instruction because those statistics are not relevant for that purpose under *Nelson*.

The People disagree, arguing *Nelson* held (at pp. 1266-1267) that "the rarity statistic derived from the product rule remains relevant in cases where the defendant was identified as a suspect through a match or 'cold hit' in a DNA database." Thus, where, as here, the statistical DNA evidence was presented to show the rarity of defendant's DNA profile in the general population, the introduction of those statistics for that purpose was proper. Thus, an objection would have been futile.

Disagreement over the meaning of *Nelson* is not without precedent. Our colleagues in the Fifth Appellate District faced the same issue in *People v. Xiong* (2013) 215 Cal.App.4th 1259 (*Xiong*), where the parties disagreed on the relevance and admissibility of statistical evidence consisting of random match probabilities in cold hit cases. (*Id.* at p. 1270.) There, the prosecution's DNA expert "presented the statistics as random match probabilities," but explained that the statistics revealed "the rarity of the profile found" and "how rare this is across the board." (*Id.* at pp. 1270-1271.)

Responding to the same portion of *Nelson* relied upon by defendant here, the *Xiong* court acknowledged that "*Nelson*'s quotations from *Jenkins* and its use of the term 'rarity statistic' do suggest that *Nelson* concluded the statistics generated by the product rule are relevant in cold hit cases *only* when stated as a profile frequency (which the government in *Jenkins* called the 'rarity statistic')." (*Xiong, supra*, 215 Cal.App.4th at pp. 1272-1273.) However, upon further consideration, the *Xiong* court stated its belief that "*Nelson* concluded more broadly that both the frequency and the random match probability are relevant in cold hit cases," explaining that, "[d]espite *Nelson's* confusing use of the term 'rarity statistic,' the court spoke in broad terms of the relevance and admissibility of statistics *calculated by the product rule*, which would include both frequencies and random match probabilities." (*Id.* at p. 1273.) The court determined that "*Nelson's* use of the terms 'frequency' and 'random match probability' demonstrates that

the court was not drawing a distinction between the two." (*Ibid.*) Finally, the court found instructive a legal treatise written by Justice Chin, the author of *Nelson*, stating: " 'The rarity of the DNA profile shared by the perpetrator and defendant, *expressed by the random match probability statistic*, is always relevant and admissible, even in cold hit cases where the defendant was originally identified in a database search: " '[I]t is relevant for the jury to know that most persons of at least major portions of the general population could not have left the evidence samples.' [Citation.] We agree . . . that this remains true even when the suspect is first located [through] a database search." (*People v. Nelson[, supra,]* 43 Cal.4th [at p.] 1267.)' (Chin et al., Forensic DNA Evidence: Science and the Law (The Rutter Group 2012) Statistics for Autosomal STR Profiles, § 5:4, [p]p. 5-9.)" (*Xiong, supra*, 215 Cal.App.4th at pp. 1273-1274.) Based on those factors, the *Xiong* court agreed that "both the frequency and the random match probability are relevant in cold hit cases," adding, "[t]hey are, after all, two ways of representing the same thing, the same numbers couched in different concepts." (*Id.* at p. 1274.)

The *Xiong* court observed that neither the frequency nor the random match probability statistics lose their relevance when a match is found in a database because neither has anything to do with a particular defendant or suspect or how he was identified ("[t]he frequency assesses how few people possess the perpetrator's profile, and the random match probability assesses how unlikely it is that a random person possesses the perpetrator's profile") and both can be calculated before a suspect is located. In other words, both "are fixed and unchanging" such that, "[w]hen a suspect is located by whatever means, the frequency and probability of the perpetrator's profile remain the same." (*Xiong, supra,* at p. 1274.)

The *Xiong* court further observed that, because "both statistics refer to the rarity of the profile in the *relevant population(s)*" and generally "an offender database is not the relevant population," "the chance of finding a match *in a database* generally does not

37

matter." (*Xiong, supra,* 215 Cal.App.4th at p. 1274.) In response to the argument that the random match probability is not relevant in cold hit cases because the match to the defendant is not random, the *Xiong* court stated, "The point is the rarity of, or the chance of finding, the *perpetrator's* profile in the *perpetrator's* population(s). The chance of finding a particular defendant in an artificially created 'population' of criminals and arrestees is not germane." (*Id.* at pp. 1274-1275.) The court added that, "when a particular defendant is found by searching an offender database, that database of criminals and arrestees does not necessarily become the relevant population for gauging the rarity of the profile in a meaningful way. The relevant population(s) are generally the major populations in the United States because they provide a jury with the most useful estimates, regardless of the fact that the particular defendant was found as a match by looking through a different population." (*Id.* at p. 1275.)

Lastly, the *Xiong* court noted that " 'the fact that here, the genetic profile from the evidence sample (the perpetrator's profile) matched the profile of someone in a database of criminal offenders, does not affect the strength of the evidence against appellant. The strength of the evidence against him (at least in terms of the DNA evidence) depends upon the confirmatory match between *his* profile and that of the perpetrator, and the calculation of the frequency of the perpetrator's profile in the relevant population. That population is the population of possible perpetrators, not the population of convicted offenders whose DNA has been entered into [the DNA database]. The fact appellant was first identified as a possible suspect based on a database search simply does not matter.' [Citation.]" (*Xiong, supra*, 215 Cal.App.4th at p. 1276, quoting *People v. Johnson* (2006) 139 Cal.App.4th 1135, 1150-1151, fns. omitted.)

We find the reasoning in *Xiong* to be persuasive. The fact that defendant was found by searching a population of offenders in an offender database does not change the fact that the major populations in the United States are the relevant populations for gauging the *rarity* of the profile. "The point is the rarity of, or the chance of finding, the

*perpetrator's* profile in the *perpetrator's* population(s)." (*Xiong, supra,* 215 Cal.App.4th at pp. 1274-1275.)  Indeed, the *Nelson* court noted that, "[a]lthough the product rule no longer represents the random match probability in a cold hit case, the *Jenkins* court ultimately agreed . . . 'that regardless of the database search, the rarity statistic is still accurately calculated and appropriately considered in assessing the significance of a cold hit. . . . [W]hile a database search changes the probability of obtaining a match, it does not change how rare the existence of that specific profile is in society as a whole. . . . This rarity is . . . both consistent and relevant regardless of the fact that [the defendant's] identification is the product of a database search.' [Citation.] [¶] In a non-cold-hit case, we said that '[i]t is relevant for the jury to know that most persons of at least major portions of the general population could not have left the evidence samples.' [Citation.] We agree with other courts that have considered the question (the Court of Appeal in this case; *People v. Johnson, supra*, 139 Cal.App.4th 1135; and *Jenkins, supra*, 887 A.2d 1013) that this remains true even when the suspect is first located through a database search.  The database match probability ascertains the probability of a match from a given database.  'But the database is not on trial.  Only the defendant is.' (Modern Scientific Evidence, *supra*, § 32:11, pp. 118–119.)  Thus, the question of how probable it is that the *defendant*, not the database, is the source of the crime scene DNA remains relevant. (*Id.* at p. 119.)  The rarity statistic addresses this question." (*Nelson, supra*, 43 Cal.4th at pp. 1266-1267.)

Here, Sewell explained that her conclusions were derived by comparing defendant's DNA profile to the profiles developed from the crime scene evidence, and then calculating the frequency at which that DNA profile "occur[s] at random among unrelated individuals" in the general African American, Hispanic, and Caucasian populations.  Under *Nelson,* the rarity of the DNA profile shared by the perpetrator of the charged offenses and defendant, expressed by the random match probability statistic, is relevant and admissible, even where, as here, the defendant was originally identified after

39

his profile was uploaded to an offender DNA database and that search returned a "cold hit."

Under these circumstances, because a defense objection and request for a limiting instruction would have been futile, we have no trouble concluding there could have been a satisfactory explanation for counsel's failure to act in the manner challenged. We therefore reject defendant's claim of ineffective assistance of counsel.

V

*Fees and Fines*

A.     *Restitution and Parole Revocation Fines*

At sentencing, the trial court imposed "a restitution fine pursuant to Penal Code section 1202.4 in the amount of $200." The court said nothing regarding a parole revocation fine. However, the court's minute order reflects a "$10,000 restitution fine purs[uant to Penal Code section] 1202.4," and an "[a]dditional $10,000 restitution fine purs[uant to Penal Code section] 12022.45 is stayed." The abstract of judgment also reflects restitution and parole revocation fines in the amount of $10,000. Defendant contends the restitution fine must be reduced to $200 to comport with the court's oral pronouncement of judgment. We agree.

While the minute order and abstract of judgment both reflect a $10,000 restitution fine pursuant to sections 1202.4 and a $10,000 parole revocation fine pursuant to 1202.45, the trial court orally imposed "a restitution fine pursuant to Penal Code section 1202.4 in the amount of $200," and did not impose a parole revocation fine at all. The abstract of judgment summarizes and must accurately reflect the oral pronouncement of judgment. (*People v. Mitchell* (2001) 26 Cal.4th 181, 185-186; *People v. Mesa* (1975) 14 Cal.3d 466, 471; *People v. Zackery* (2007) 147 Cal.App.4th 380, 389 (*Zackery*).) Where a discrepancy exists between the oral pronouncement of judgment and an abstract of judgment, the oral pronouncement controls. (*Zackery*, *supra,* 147 Cal.App.4th at

40

p. 385.) Any discrepancy is presumed to be a clerical error, which can be corrected at any time to reflect the court's oral pronouncement. (*People v. Farell* (2002) 28 Cal.4th 381, 384, fn. 2; *Mitchell, supra,* 26 Cal.4th at pp. 183, 185-188; *Mesa, supra,* 14 Cal.3d at p. 471.) Accordingly, we order the minute order and abstract of judgment be corrected to conform to the sentence actually imposed by the court, that is, to reduce the restitution fine imposed pursuant to section 1202.4 from $10,000 to $200.

Defendant contends the $10,000 parole revocation fine reflected in the minute order and abstract of judgment was not orally imposed by the court and must be stricken. He acknowledges, however, that section 1202.45 mandates imposition of a fine whenever a sentence includes a period of parole, and he therefore contends a minimum parole revocation fine of $200 should be imposed, but stayed, by operation of law. Again, we agree.

Where, as here, the clerk included in the court's minutes and the abstract of judgment a $10,000 fine that was not part of the oral pronouncement of judgment, that fine must be stricken from the minutes and the abstract. (*Zackery, supra,* 147 Cal.App.4th at pp. 387-389.) However, section 1202.45 mandates imposition of a parole revocation fine in the same amount as that imposed pursuant to section 1202.4 (*People v. Smith* (2001) 24 Cal.4th 849, 851 [upon imposition of a $200 restitution fine, the trial court was required by statute to impose but stay a parole revocation fine in the same amount].) Accordingly, we order the minute order and abstract of judgment be corrected to reflect a $200 parole revocation fine imposed but stayed pursuant to section 1202.45.

We reject the People's argument that, because defendant's residential burglaries were violent felonies and he has an extensive criminal history, it is "simply not possible," indeed it is "inconceivable," that the trial court intended to impose only a minimum restitution fine. A trial court has discretion in determining the amount of restitution to impose pursuant to section 1202.4, subdivision (b)(1). (*People v. Villalobos* (2012)

41

54 Cal.4th 177, 180-181.)  There is nothing in the record to suggest that discretion was abused.

We further reject the People's argument that the trial court's true intention to impose $10,000 restitution and parole revocation fines is evidenced by the court's statement that it intended to follow the recommendation of probation "with one exception"—the imposition of four additional one-year terms—not set out in the probation report.  The trial court stated its tentative decision was "to follow the recommendations of the probation department *except as I note and impose the following*."  The court tentatively imposed sentence, which included "one additional year for each of the four counts."  After considering argument from counsel and defendant, himself, the court imposed the final sentence, which included imposition of a $200 restitution fine pursuant to section 1202.4.  From this record, we cannot conclude that the trial court intended to impose a $10,000 restitution fine.

B.    *Presentence Probation Report Fee*

Defendant contends the trial court never orally imposed the $702 presentence probation report fee reflected in both the minute order and the abstract of judgment, and thus that fee must be stricken.  The People properly concede the point.  Section 1203.1b provides for the imposition of a fee to cover reasonable probation costs, including the cost of preparing the presentence probation report.  However, imposition of the fee is not mandatory.  (§ 1203.1b, subd. (a).)  The trial court did not orally impose such fee.

Because the oral pronouncement of judgment controls when a discrepancy exists between the oral pronouncement and the abstract of judgment (*Zackery*, *supra,* 147 Cal.App.4th at p. 385), we order the $702 presentence probation report fee stricken from the minute order and the abstract of judgment.

42

C.    *Main Jail Booking and Classification Fees*

Defendant contends the court imposed a $263.85 main jail booking fee and a $28.75 main jail classification fee without making a finding of his current ability to pay, as required by Government Code section 29550.2. He urges that, because, there is insufficient evidence to support the challenged fee, his failure to raise the issue at sentencing does not forfeit his claim on appeal. We disagree.

The presentence probation report recommended that defendant pay "a $263.85 main jail booking fee" and "a $28.75 main jail classification fee," both "pursuant to Section 29550.2 of the Government Code, payable through the Court's installment process." At the sentencing hearing, the court imposed both fees as recommended in the probation report. Defendant did not object to that portion of the court's oral pronouncement. The clerk included the fees in the minute order and the abstract of judgment.

This court has previously held that if a defendant does not object in the trial court to the imposition of a fee or fine, the issue is forfeited. (*People v. Crittle* (2007) 154 Cal.App.4th 368, 371 (*Crittle*) [crime prevention fine -- Pen. Code, § 1202.5, subd. (a)]; *People v. Hodges* (1999) 70 Cal.App.4th 1348, 1357 [jail booking fee -- Gov. Code, § 29550.2].) We have applied the forfeiture rule even when the claim on appeal is that there is not sufficient evidence to support the imposition of the fine or fee. (*People v. Gibson* (1994) 27 Cal.App.4th 1466, 1467, 1468–1469 [restitution fine—Gov. Code, former § 13967, subd. (a) ].) Consistent with these decisions, in *People v. McCullough* (2013) 56 Cal.4th 589, 591, 597 (*McCullough*), our Supreme Court recently held that a challenge to the sufficiency of the evidence to support a booking fee under Government Code section 29550.2 is forfeited if not raised in the trial court.

In light of *McCullough*, we adhere to the rule from our previous decisions that a failure to object to a fee or fine in the trial court forfeits the issue, even where the statute

43

contemplates a judicial finding of ability to pay and the defendant challenges the sufficiency of the evidence to support such a finding. (*People v. Gibson, supra*, 27 Cal.App.4th at pp. 1467, 1468–1469.) "As a matter of fairness to the trial court, a defendant should not be permitted to assert for the first time on appeal a procedural defect in imposition of a restitution fine, i.e., the trial court's alleged failure to consider defendant's ability to pay the fine. [Citation.] Rather, a defendant must make a timely objection in the trial court in order to give that court an opportunity to correct the error; failure to object should preclude reversal of the order on appeal." (*Id*. at p. 1468.) Not applying forfeiture principles in such cases not only encourages attorney gamesmanship, but depletes judicial resources and wastes taxpayer money. (See *Gibson*, at pp. 1468–1469.) Accordingly, we conclude defendant's failure to raise the issue of his ability to pay the main jail booking and main jail classification fees in the trial court forfeits his claim on appeal.

### D.      *Crime Prevention Program Fine*

The probation report recommended that "[d]efendant pay a fine of $40.00 ($10.00 x 4 cases) for crime prevention programs pursuant to Section 1202.5 of the Penal Code." The court accepted the recommendation and imposed sentence as follows: "[A]s required under the law, [defendant] shall pay a fine of $40 for crime prevention programs pursuant to section 1202.4 [sic] of the Penal Code . . . ." Defendant did not object. Both the minute order and the abstract of judgment reflect a crime prevention program fine in the amount of $40 pursuant to section 1202.5.

Defendant contends section 1202.5 authorizes just one $10 fine per case, thus requiring that the additional $30 be stricken, resulting in a fine of $10, plus $24 in penalty assessments, for a total fine of $34.

The People agree that $30 of the $40 fine should be stricken, and that the remaining $10 is subject to penalty assessments. However, the People argue penalties,

assessments, and surcharges in the amount of $54 should be added to the $10 fine, for a total fine of $64.

Section 1202.5 provides that, "[i]n any case in which a defendant is convicted of any of the offenses enumerated in Section [459] . . . , the court shall order the defendant to pay a fine of ten dollars ($ 10) in addition to any other penalty or fine imposed." (*Crittle, supra,* 154 Cal.App.4th at p. 371; § 1202.5, subd. (a).) The trial court imposed four $10 fees, one for each of the four burglary convictions. "[T]he crime prevention fine can be imposed only once '[i]n any case.' (§ 1202.5, subd. (a).) Although defendant was accused and convicted of committing multiple offenses, this was still a single case. (See § 954.) Thus, only one $10 fee could be imposed." (*Crittle, supra*, 154 Cal.App.4th at p. 371.) Because three of the four fines were unauthorized, defendant's failure to object does not forfeit the claim on appeal. (*Ibid.*)

Next, while the parties agree that mandatory penalties, surcharges, and assessments should have been imposed by the trial court, they disagree on the proper amount to be imposed. The parties agree, as do we, that imposition of the following amounts is proper: a $10 penalty assessment (Pen. Code, § 1464, subd. (a)(1)); a $7 penalty assessment (Gov. Code, § 76000, subd. (a)(1)); a $2 state surcharge (Pen. Code, § 1465.7, subd. (a)); a $1 DNA Identification Fund penalty (Gov. Code, § 76104.6, subd. (a)(1)); a $1 DNA Identification Fund (state-only) penalty (Gov. Code, § 76104.7, subd. (a)); and a $3 court facilities construction fund penalty (Gov. Code, § 70372, subd. (a)(1)), for a total of $24. Because these penalties, surcharges, and assessments are mandatory, "their omission may be corrected for the first time on appeal." (*People v. Castellanos* (2009) 175 Cal.App.4th 1524, 1530.)

The People argue, however, that an additional $30 court facilities assessment should also be imposed pursuant to Government Code section 70373. We disagree. "Government Code section 70373, subdivision (a)(1) . . . provides, in part: 'To ensure and maintain adequate funding for court facilities, an assessment shall be imposed on

every conviction for a criminal offense . . . .  The assessment shall be imposed in the amount of thirty dollars ($ 30) for each . . . felony . . . .'  This provision was added to the Government Code by Statutes 2008, chapter 311, section 6.5; thus, its effective date is January 1, 2009.  [Citation.]"  (*People v. Knightbent* (2010) 186 Cal.App.4th 1105, 1111.)

As defendant correctly points out, and the People apparently overlook, the probation report recommended a court facility fee in the amount of $120 ("$30.00 x 4 convictions") pursuant to Government Code section 70373; the court's oral pronouncement of sentence included "a mandatory court facility fee per conviction per section 7030 [sic] of the Government Code in the amount of $120"; and both the minute order and the abstract of judgment reflect a court facility fee in the amount of $120, with the abstract specifying that such fee is "pursuant to Section 70373 of the Government Code."  Defendant is not subject to an additional court facility fee assessment in conjunction with the crime prevention program fine.

Therefore, we order the minute order and abstract of judgment be corrected to reflect a crime prevention program fine in the amount of $34.

VI

*Sentence Does Not Constitute*

*Cruel and/or Unusual Punishment*

Defendant contends the trial court erred in denying his *Romero* motion which sought relief from the 144 years to life sentence, which he claims constitutes cruel and unusual punishment under the state and federal Constitutions.

Defendant fails to make any showing of an abuse of discretion in the denial of his *Romero* motion.  (*People v. Carmony* (2004) 33 Cal.4th 367, 376-377 (*Carmony*) [" ' "[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary.  [Citation.]  In the absence of such a

46

showing, the trial court is presumed to have acted to achieve the legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review." ' "].)  In any event, as we shall explain, his sentence does not constitute cruel and/or unusual punishment and therefore his claim fails.

The Eighth Amendment to the United States Constitution proscribes "cruel and unusual punishment" and "contains a 'narrow proportionality principle' that 'applies to noncapital sentences.' " (*Ewing v. California* (2003) 538 U.S. 11, 20 [155 L.Ed.2d 108, 117] (*Ewing*) quoting *Harmelin v. Michigan* (1991) 501 U.S. 957, 996-997 [115 L.Ed.2d 836, 865-866] (*Harmelin*); *Lockyer v. Andrade* (2003) 538 U.S. 63, 72 [155 L.Ed.2d 144, 156].)  While this proportionality principle " 'does not require strict proportionality between crime and sentence,' " it does prohibit " 'extreme sentences that are "grossly disproportionate" to the crime.' " (*Ewing*, *supra*, 538 U.S. at p. 23 [155 L.Ed.2d at p. 119], quoting *Harmelin*, *supra*, 501 U.S. at p. 1001 [115 L.Ed.2d at p. 869].)

This proportionality analysis requires consideration of three objective criteria:  "(i) the gravity of the offense and the harshness of the penalty; (ii) the sentence imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions."  (*Solem v. Helm* (1983) 463 U.S. 277, 292 [77 L.Ed.2d 637, 650].)  However, in a noncapital case, a successful proportionality challenge will be " 'exceedingly rare' " (*Ewing*, *supra*, 538 U.S. at p. 21 [155 L.Ed.2d at p. 117], quoting *Rummel v. Estelle* (1980) 445 U.S. 263, 272 [63 L.Ed.2d 382, 390]), and it is only in the rare case where a comparison of the crime committed and the sentence imposed leads to an inference of gross disproportionality that the second and third criteria come into play.  (*Harmelin, supra,* 501 U.S. at p. 1005 [115 L.Ed.2d at pp. 871-872] (conc. opn. of Kennedy, J.).)

Article I, section 17 of the California Constitution proscribes "cruel or unusual punishment."  Although this language is construed separately from the federal constitutional ban on "cruel and unusual punishment" (*People v. Carmony* (2005)

127 Cal.App.4th 1066, 1085), the method of analysis is similar: the reviewing court considers "the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society"; the comparison of "the challenged penalty with the punishments prescribed in the same jurisdiction for different offenses"; and the comparison of "the challenged penalty with the punishments prescribed for the same offense in other jurisdictions . . . ." (*In re Lynch* (1972) 8 Cal.3d 410, 425-427, italics omitted.) As under federal law, we are not required by state law to engage in the second and third prongs of the analysis. (*People v. Weddle* (1991) 1 Cal.App.4th 1190, 1196-1198.) The purpose of this analysis is to determine whether the punishment is "so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch, supra,* at p. 424, fn. omitted.) "A defendant has a considerable burden to overcome when he challenges a penalty as cruel or unusual. The doctrine of separation of powers is firmly entrenched in the law of California and the court should not lightly encroach on matters which are uniquely in the domain of the Legislature." (*People v. Bestelmeyer* (1985) 166 Cal.App.3d 520, 529.)

Our review of the first prong under either analysis leads us to conclude defendant's punishment is not grossly disproportionate. As the trial court noted in denying the *Romero* motion and finding the sentence of 44 years followed by 100 years to life appropriate, defendant's criminal history is "virtually uninterrupted," consisting of residential burglaries committed in the middle of the night when the victims were home, resulting in somewhat of "a virtual one man crime wave." The court noted that, after having served time for his numerous prior convictions, defendant quickly returned to his old ways of burglarizing homes in the middle of the night while the victims slept, but in a more sophisticated manner. The court characterized defendant as a "career criminal . . . the exact kind of a person for whom these [three-strike] sentences were enacted." The record confirms that defendant's 10 prior and four current convictions all involved

residential burglaries where the defendant broke into the home of sleeping victims under cover of night, boldly helping himself to personal property and, in some cases, beer in the refrigerator and food in the cupboard. Despite having served a significant portion of a 24-year sentence for the prior convictions, he wasted relatively little time in committing another string of residential burglaries which resulted in the current convictions. Defendant's repeated criminal acts demonstrate that he is " 'simply incapable of conforming to the norms of society as established by its criminal law,' " thus justifying the Legislature's legitimate interest in dealing with him " 'in a harsher manner.' " (*Ewing*, *supra*, 538 U.S. at p. 29 [155 L.Ed.2d at p. 122].)

As defendant acknowledges, residential burglaries are considered violent felonies because of the potential for violence. And while he argues that potential was never realized in any of his crimes because he never possessed a weapon and never threatened or menaced his victims, it is not hard to imagine what might have happened had one of those victims, having been startled from sleep by an intruder and not knowing whether that intruder posed a threat to life and limb, confronted defendant, possibly with a defensive weapon of his or her own.

Under these circumstances, we cannot say that a sentence of 44 years followed by 100 years to life for four first degree residential burglaries committed while the victims slept nearby, where defendant's criminal history includes 10 prior convictions for virtually identical burglaries, and he was on informal probation when he committed the current crimes, was "so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch*, *supra*, 8 Cal.3d at p. 424.)

### DISPOSITION

The judgment is modified to impose a $200 restitution fine (Pen. Code, § 1202.4), a $200 parole revocation fine (Pen. Code, §1202.45), and a $34 crime prevention

program fine (Pen. Code, § 1202.5).  The judgment is further modified to strike the $702 presentence probation report fee (Pen. Code, § 1203.1b).  As modified, the judgment is affirmed.  We direct the trial court to amend the sentencing minute order and abstract of judgment accordingly, and to send a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.


       HULL       , Acting P. J.


We concur:


     ROBIE     , J.


     HOCH     , J.